# In the United States Court of Federal Claims

No. 16-826L
(Filed: November 20, 2019)

|  |  |  |
|---|---|---|
| MINISTERIO ROCA SOLIDA, INC., | ) ) ) | Keywords: Fifth Amendment; Takings Clause; Takings Claim; Flooding; |
| Plaintiff, | ) ) | Summary Judgment; Causation; Foreseeability; Nevada Water Law; |
| v. | ) ) | Vested Water Rights |
| THE UNITED STATES OF AMERICA, | ) ) |  |
| Defendant. | ) ) ) ) ) |  |

*Zhonette Brown*, Mountain States Legal Foundation, Lakewood, CO, for Plaintiff.

*Davené D. Walker*, Environment and Natural Resources Division, Natural Resources Section, U.S. Department of Justice, Washington, DC, for Defendant, with whom were *Lucinda Bach*, *Jean E. Williams*, Deputy Assistant Attorney General.

## OPINION AND ORDER

**KAPLAN, Judge.**

The Plaintiff in this Fifth Amendment takings case, Ministerio Roca Solida, Inc. ("Solid Rock" or "the Ministry"), is a nonprofit church incorporated under the laws of the State of Nevada. The Ministry owns a forty-acre parcel of land that lies within the boundaries of the Ash Meadows National Wildlife Refuge ("Ash Meadows NWR" or "the Refuge") in Nevada. Its takings claims have their genesis in actions taken by the United States Fish and Wildlife Service ("FWS" or "the Service") pursuant to the Fairbanks and Soda Springs Restoration Project ("the Restoration Project" or "the Project"). As part of the Project, and in an effort to save a native fish species, the FWS caused spring waters that had previously flowed through the Ministry's property to be re-routed into a new channel (hereinafter "the restoration channel"). The restoration channel traverses Refuge property some 500 feet to the east of the Ministry's land. The Ministry alleges that FWS's diversion of the water into the restoration channel has caused flooding on its property. The Ministry also claims that the diversion of the spring water away from its property and into the restoration channel resulted in a Fifth Amendment taking of certain vested water rights.

The case is currently before the Court on the government's motion for summary judgment as to both takings claims. The government contends as to the flooding claim that the undisputed facts show: 1) that the Restoration Project did not cause the flooding about which the Ministry complains; and 2) that FWS did not intentionally flood the Ministry's land, nor was such flooding reasonably foreseeable when the restoration channel was built. It further contends that—in light of the pendency of a claim filed by the Ministry with the Nevada State Engineer ("the NSE" or "the State Engineer")—Solid Rock's water rights takings claim is not ripe for review and/or that the Court should abstain from deciding the existence and scope of the Ministry's water rights. The government also argues that, in any event, the Ministry has failed to provide evidence sufficient to support its vested water rights takings claim on the merits.

The Court concludes, for the reasons set forth below, that there are material factual disputes regarding both the cause of the flooding of the Ministry's property and whether such flooding was reasonably foreseeable. The Court finds that the Ministry's claim that the restoration project effected a taking of water rights granted to it under Nevada law is ripe for review but that the government is entitled to summary judgment as to that claim on the merits. The government's motion for summary judgment is therefore **GRANTED-IN-PART** and **DENIED-IN-PART**.

## BACKGROUND[1]

### I.    The Patch of Heaven Camp

Ministerio Roca Solida, Inc. is a nondenominational Christian ministry located in Las Vegas, Nevada, and founded in 2006 by Pastor Victor Fuentes, a Cuban refugee. Corrected Compl. ("Compl.") ¶ 5, ECF No. 6. In November 2006, Solid Rock purchased a forty-acre parcel of land in Nye County, Nevada for $500,000. Id. The property—on which the Ministry has established the "Patch of Heaven Camp" (hereafter, "the Camp")—is one of the few remaining privately-owned parcels of land within the boundaries of the Ash Meadows NWR. See Pl.'s Resp. in Opp'n to Def.'s Mot. Summ. J. ("Pl.'s Resp.") Ex. WW, ECF No. 44-48.

The Ash Meadows NWR is part of the Desert National Wildlife Refuge Complex. It is located "northwest of Pahrump, Nevada, less than 5 miles from the California-Nevada border and encompasses approximately 24,000 acres." U.S. Mot. for Summ. J. ("Def.'s Mot.") Ex. 2, at US000961, ECF No. 41-2. The FWS purchased the land which became the Ash Meadows NWR from the Nature Conservancy in 1984. Def.'s Mot. Ex. 1, at US000475, ECF No. 41-1.

After Solid Rock purchased the forty-acre parcel, it refurbished certain structures that the previous owner had placed on the land. It used these structures for a chapel, a kitchen, a dining hall, bunk houses, restrooms, a shower facility, and a snack bar. Pl.'s Resp. at 4, ECF No. 44 (citing Pl.'s Resp. Ex. E, at 60:22–63:12, ECF No. 44-5).

---

[1] The facts in this section are based on the parties' pleadings and the exhibits submitted in connection with the government's motion for summary judgment. Unless specifically noted, the facts set forth are not in dispute.

In its complaint, Solid Rock alleges that "[a]ppurtenant to Solid Rock Ministry's forty-acre parcel are vested water rights to a desert spring-fed stream that has traversed the Plaintiff's private property since at least the year 1881." Compl. ¶ 6. Before the actions that gave rise to this lawsuit, Solid Rock used the stream for baptisms and other purposes. Id. According to the Ministry, the stream "also contributed significantly to an atmosphere suitable for religious meditation and fed a recreational pond utilized by attendees of the . . . [Ministry] camp." Id.

## II.     The Fairbanks and Soda Springs Restoration Project

In the fall of 2001, the Service "began the process of developing a Comprehensive Conservation Plan" ("CCP") for the Desert National Wildlife Refuge Complex. Def.'s Mot. Ex. 2, at US000961. The final version of the CCP, issued in August 2009, contained a fifteen-year strategy for achieving conservation goals for the refuges within the Refuge Complex, including the Ash Meadow NWR. Def.'s Mot. at 11, ECF No. 41 (citing id. Ex. 2, at US000967).

The Service initiated the Restoration Project to comply with the 2009 CCP. Its purpose was to restore the outflows of the Fairbanks and Soda Springs, which lie at the north end of the Refuge and are the first springs to feed into the Carson Slough. See Def.'s Mot. Ex. 3, at US000257, ECF No. 41-3. According to an environmental assessment prepared for the Project, "anthropogenic alterations" to the water from the springs within the Carson Slough, including the diversion of the water "into a series of ditches," had caused "the entire wetland ecosystem . . . [to] become infested with noxious weeds and aquatic invasive species." Id. These alterations "decrease[d] the viability for endemic species recovery and provide[d] habitat inconsistent with the needs of the species the Refuge was created to protect." Id.

To mitigate these conditions, the Service developed a plan to restore the "[c]onnectivity of the springs' outflows with the extensive wetland in the Carson Slough" and to increase "the amount of suitable stream channel and wetland habitat for native fish." Id. The Service planned to accomplish these ends by removing existing physical barriers and installing culverts that could be passed by native fish. Id. As relevant to this case, the Plan also provided for rerouting the spring waters that then traversed the Ministry's property "to an unobstructed route on refuge land." Def.'s Mot. at 14 (citing id. Ex. 3, at US000261); see also Pl.'s Resp. Ex. M at 1–2, ECF No. 44-13 (maps showing water distribution before and after the Project).

## III.    Flooding of the Ministry's Property

Pastor Fuentes first became aware of the Restoration Project in 2009. Pl.'s Resp. Ex. K, at 95–96, ECF No. 44-11. According to Pastor Fuentes, he was told by Sharon McKelvey, the manager of the Ash Meadows NWR, that the FWS was going to take action to protect the "speckled dace," a species of fish. Id. at 96. She also advised him that the FWS owned the water rights to the spring waters that it intended to divert into the restoration channel. Id. After the initial meeting with Ms. McKelvey, Pastor Fuentes met with other Service personnel to discuss possible alternatives that would not involve rerouting the water that crossed the Ministry's property, but no resolution was reached. Id. at 99–100.

The construction work for the project was performed by Otis Bay Ecological Consultants ("Otis Bay") and was completed during the winter of 2010–2011. Def.'s Mot. Ex. 15, at

US010415, ECF No. 41-15. Otis Bay built a dam upstream from the Camp which diverted the two spring-fed streams that had supplied the water that flowed through the Ministry's land into a channel on Refuge property that was 500 feet to the east of the Ministry's property. See Pl.'s Resp. Ex. M, at 1–2.

Solid Rock alleges that its property has been subjected to several destructive floods as a result of the dam's construction and the creation of the restoration channel. Specifically, it claims that the "water diversion project and its water flow replacement channel was 'engineered' in such a way as not to accommodate precipitation or precipitation runoff." Compl. ¶ 9.

Thus, according to the Ministry, on approximately December 23, 2010 "large amounts of water from Defendant's newly erected dam and waterway relocation project overflowed the Defendant's man-made channels, and for the first time . . . flooded the area of Plaintiff's property occupied by structures." Pl.'s Resp. at 8. Solid Rock further contends that there have since been three similar floods: "one in late October-early November 2015; one in early to mid-January 2016; and one in early to mid-July 2016." Id.

## IV.   Water Rights Under Nevada Law

Nevada water law is not based on common law "riparian rights." Instead, it recognizes usufructuary rights—i.e., the right to appropriate and use water for beneficial purposes. See Application of Filippini, 202 P.2d 535, 537 (Nev. 1949) (observing that "the owner of a water right does not acquire a property in the water as such, at least while flowing naturally, but a right gained to use water beneficially which will be regarded and protected as real property" (quoting Nenzel v. Rochester Silver Corp., 259 P. 632 (Nev. 1927))); see also Nev. Rev. Stat. § 533.035 (stating that "[b]eneficial use shall be the basis, the measure and the limit of the right to the use of water").

Further, "Nevada, like most western states, is a prior appropriation state." Desert Irrigation, Ltd. v. State, 944 P.2d 835, 837 n.1 (Nev. 1997). "As a general proposition, under the prior appropriation doctrine the right to a consumptive use of water belongs to the first person to make beneficial use of it." Stockton E. Water Dist. v. United States, 583 F.3d 1344, 1355 (Fed. Cir. 2009). "That person becomes the owner of a right to the quantity of water put to beneficial use, and that right takes priority over later claimants to the water." Id.; see also Bailey v. United States, No. 2018-1323, slip op. at 12 (Fed. Cir. Nov. 14, 2019).

Two types of water rights under Nevada Law are relevant here—vested rights and permitted rights. "Vested" water rights are those that existed under Nevada's common law before the enactment of Nevada's statutory water law. See Andersen Family Assocs. v. Hugh Ricci, P.E., 179 P.3d 1201, 1204 (Nev. 2008). Such rights exist on the basis of "actual diversion of the [water], with intent to apply it to a beneficial use prior to the enactment of any statutory water law, relative to appropriation," Application of Filippini, 202 P.2d at 537, i.e., prior to 1905, see Jason King, State Engineer, Summary of Statutory Procedures for Filing Claims of Vested Rights, Making Application for a Water Right and a Summary of Fees of the State Engineer, at 1 (Apr. 2018), http://water.nv.gov/Documents/SE_Procedures_Fees_Brochure.pdf (defining vested rights to "surface water [as] those rights for which the work to establish beneficial use was initiated prior to March 1, 1905, the date of adoption of Nevada's Water Law"). And in

accordance with § 533.085 of Nevada's Revised Statutes "[n]othing contained in [the Nevada Water Code] . . . impair[s] the vested right of any person to the use of water . . . ."

Unlike "vested" rights, "permitted" rights are those rights to the appropriation and beneficial use of water that are acquired under Nevada's statutory scheme. Such rights are granted "after the State Engineer approves a party's 'application for water rights.'" Andersen, 179 P.3d at 1204–05. A permitted right allows the user to appropriate a specified amount of water for a particular approved purpose or purposes. Id.

Nevada has established a comprehensive scheme of administrative and judicial review for the adjudication of water rights. Under that scheme, those who wish to appropriate water must apply with the State Engineer for a permit specifying, among other things, the amount of water sought, the point of diversion, the season of use, and the beneficial use to be achieved. Nev. Rev. Stat. §§ 533.325–533.350. If unappropriated water is available, the State Engineer may issue a permit to appropriate. Nev. Rev. Stat. § 533.370.

The State Engineer's approval allows the permittee to begin the process of appropriating water and creates an inchoate usufructuary right. See Desert Irrigation, 944 P.2d at 842. Once the permit holder is able to demonstrate to the State Engineer's satisfaction that the water has been put to beneficial use as provided in the permit, the State Engineer issues a certificate of appropriation, i.e., the certificated or permitted right. Nev. Rev. Stat. § 533.425.

A permit to use water received from the State Engineer is not given conclusive effect until after an adjudication of all the water rights claims on a stream or stream system under Nev. Rev. Stat. § 533.090. Salmon River Canal Co., Ltd. v. Bell Brand Ranches, Inc., 564 F.2d 1244, 1248–49 (9th Cir. 1977); see also Nev. Rev. Stat. § 533.425. The administrative determination by the State Engineer is therefore "only a stepping stone into the judicial system," with its Order of Determination having the legal effect of a complaint once filed with the Nevada district court. Id. at 1248.

## V.   The Ministry's Administrative Claims Regarding its Water Rights

### A.   Proof of Claim V10092 and Permit 85417

The Ministry did not seek a permit or assert any vested water rights claims with the State Engineer until October 11, 2011, nine months after the completion of the Restoration Project. See Def.'s Mot. Ex. 18 (Proof V10092), at MRS0013, ECF No. 41-18. On that date, Solid Rock filed Proof of Claim V10092 in accordance with § 533.087 of the Nevada Revised Statutes. In it, the Ministry claimed a vested right to use 0.0031 cfs (cubic-feet per second) or 2.24 afa (acre-feet annually) of surface water. Id. at MRS0014 (claiming a use of 2000 gallons per day); see also Pl.'s Resp. Ex. D (Expert Report of Tim Mayer, Ph.D.), at 28–29, ECF No. 44-4 (converting 2000 gallons per day to 0.0031 cfs or 2.24 afa).[2] The right asserted, according to the Ministry,

---

[2] One of the government's experts, Dr. Tim Mayer, has characterized 2.24 afa of surface water as "less tha[n] the average flow in a garden hose." Pl.'s Resp. Ex. D, at 28–29.

was based on a pre-statutory appropriation of water for stock-watering purposes by the Ministry's predecessors in interest. Id. [3]

Over the next four years, the Nevada State Engineer took no action on Proof of Claim V10092. In the meantime, on August 28, 2015, Solid Rock filed an application to change the manner of use of its claimed vested water rights from "stock watering and domestic" to "recreation and domestic." Def.'s Mot. Ex. 19 (Application No. 85417), at US010294, ECF No. 41-19. The Ministry explained that it intended to use the water "in connection with baptisms and various recreational activities in connection with an operating [Ministry] retreat." Id. at US010295.

On October 23, 2015 the Service, which itself holds numerous water rights on the Refuge, see Def.'s Mot. Ex. 17 (Decl. of Tim Mayer), ¶ 3, ECF No. 41-17, filed a protest challenging the validity of Solid Rock's vested water rights claim and its change application, Pl.'s Mot. Ex. D, at 29, ECF No. 44-4. On June 14, 2016, the NSE rejected the Service's protest, granted Solid Rock's change application, and issued Permit 85417. Def.'s Mot. Ex. 20, ECF No. 41-20; id. Ex. 21, ECF No. 41-21. Although it explicitly noted that its findings did not constitute an adjudication of the Ministry's vested rights claim, the NSE determined that Solid Rock "provided evidence sufficient to establish that the claim of vested right under Proof of Appropriation V-10092 [wa]s plausible." Def.'s Mot. Ex. 21, at MRS0388.

About five weeks after the NSE granted Permit 85417, on July 21, 2016, Solid Rock complained to the Nevada Division of Water Resources ("the Division") that the Service was continuing to divert the water to which the Ministry was entitled under the permit. See Pl.'s Resp. Ex. D, at 30; Def.'s Mot. Ex. 23, at US010384, ECF No. 41-23. After confirming the allegations based on a site visit, the state authorities sent the Service a letter dated November 4, 2016, directing it "to cease the full and complete diversion of surface water to and through Nye County APN 21-331-10 (the Solida Parcel) to ensure the permitted 0.003 cubic feet per second of water . . . will be available to be diverted." Def.'s Mot. Ex. 23, at US010386.

In response, the Service "installed a fish-proof intake, a solar power pump, and a one-inch pipeline capable of delivering a continuous 1.39 gallons per minute (gpm), to supply the permitted limit of 2.24 acre-feet annually from the Carson Slough to the point of diversion for Permit 85417." Def.'s Mot. Ex. 24, at US011228, ECF No. 41-24. The Division conducted a follow-up site investigation on March 23, 2017 and confirmed that the matter had been resolved via a letter dated January 30, 2018. Id. at US011229.

---

[3] In its claim, Solid Rock asserted that its entitlement was based on "fee simple ownership [and] complete chain of assignments from the original beneficial use predecessor." Def.'s Mot. Ex. 18, at MRS0013. Citing county records, Solid Rock stated that, during the first year of beneficial use (1887–1888), forty-five cattle, thirty-eight horses, seventy-five hogs, and 225 fowl used the stream for water. Id. The number of animals watered, the Ministry claimed, "vari[ed] up and down" in subsequent years. Id. at MRS0014.

B.     **Proof of Claim 11182 is Filed and Rejected**

In the meantime, on February 23, 2017, Solid Rock filed another claim alleging vested water rights (Proof of Claim No. 11182). This time, the Ministry claimed a vested right to an instream flow of 8.95 cfs (or 5,072 afa) of water, which it characterized as "an estimation of the flow rate of the Carson Slough through the place of use prior to 1905 . . . based on a current flow rate measurement of the main channel of the Carson Slough taken . . . approximately 0.8 miles upstream." Def.'s Mot. Ex. 26, at 5, ECF No. 41-26. The Ministry asserted a vested right to the instream flow for wildlife purposes and to "support and maintain the historic aquatic-riparian ecosystem." Id. at 6.

On April 21, 2017 however, Deputy State Engineer Kelvin Hickenbottom sent Pastor Fuentes a letter informing him that "it is highly unlikely that the claimed pre-statutory use asserted under Proof No. V-11182 would be found to be a valid claim." Def.'s Mot. Ex. 22, at 1, ECF No. 41-22.

C.     **The Nevada State Engineer Rejects the Ministry's Attempted Amendment of Proof of Claim V10092**

Some five and one-half months later, on October 4, 2017, the Ministry took a different tack, this time seeking to amend its by then approved Proof of Claim V10092. Def.'s Mot. Ex. 27, at 1, ECF No. 41-27. In the amended proof, Solid Rock marked "irrigation" as the primary use of the water to which it claimed a vested right and indicated "stock water" and "domestic" as secondary uses. Id. The Ministry claimed that it would use the water from Carson Slough to irrigate some twenty-five acres of land, and that it would need a flow of 0.21 cfs of water to do so. Id.

On December 11, 2017, Steve Walmsley, a Water Rights Specialist Supervisor at the Division, sent a letter to Pastor Fuentes informing him that the NSE had rejected the amendment to Proof of Claim V10092. Def.'s Mot. Ex. 28, at 1, ECF No. 41-28. Mr. Walmsley explained that because "[t]he use of water for domestic purposes and the watering of livestock has always been accepted as a secondary use that does not increase the volume of water consumed by irrigation," any additional claim based on irrigation as a use would have to be filed as a separate proof. Id. He also noted that any proof submitted for such purpose should include a map drawn by a licensed State Water Rights Surveyor that contained a "cultural tabulation stating the crop types and date that the acreage was put into production." Id.

D.     **The Ministry Files Proof of Claim V11308**

On July 23, 2018, Solid Rock filed yet another Proof of Claim (V11308). It again asserted vested rights to 8.95 cfs, or 5,072 afa of water (the entire flow of the Carson Slough), as it had for the rejected Proof of Claim V11182. Def.'s Mot. Ex. 30, at 1, ECF No. 41-30; see also Pl.'s Resp. Ex. D, at 2–7; Def.'s Mot. at 23. The application again listed irrigation as the primary use of the water and "stock water" and "domestic" as a secondary use. Def.'s Mot. Ex. 30, at 1. It is the Court's understanding that the NSE has not yet taken any action on Proof of Claim V11308, but that a hearing on the claim is scheduled for this December. See Def.'s Mot at 24.

## VI.     Prior Suits

Solid Rock first alleged that the Service's Restoration Project resulted in a violation of its constitutional rights in a suit filed on August 22, 2012 in the United States District Court for the District of Nevada. See Compl., Ministerio Roca Solida v. United States, No. 12-cv-1488 (D. Nev. Aug. 22, 2012). Solid Rock sought declaratory and injunctive relief alleging violations of the Due Process Clause and the First Amendment's Free Exercise Clause. See Ministerio Roca Solida v. United States, 114 Fed. Cl. 571, 573 (2014); see also Notice of Directly Related Case at 1, ECF No. 4.

Two days after it filed its complaint in the district court, Solid Rock filed a suit in this court alleging that the Service's Restoration Project and diversion of the Carson Slough effected a taking of its property without just compensation in violation of the Fifth Amendment's Takings Clause. Ministerio Roca Solida, 114 Fed. Cl. at 573. Solid Rock asked this Court to stay proceedings pending resolution of the district court claims. Id. The Court determined, however, that it lacked jurisdiction over the Ministry's complaint under 28 U.S.C. § 1500 because of the pendency of the action in the Nevada district court. Id. at 576. It therefore dismissed the complaint without prejudice. Id.

The Ministry appealed the dismissal to the United States Court of Appeals for the Federal Circuit, which affirmed this Court's decision. See generally Ministerio Roca Solida v. United States, 778 F.3d 1351 (Fed. Cir. 2015). The Ministry then petitioned the United States Supreme Court for a writ of certiorari, which was denied. Ministerio Roca Solida, Inc. v. United States, 136 S. Ct. 479 (2015).

The Ministry initially proceeded with its suit in the district court. On July 8, 2016, however, the case was dismissed by agreement of the parties pursuant to Federal Rule of Civil Procedure 41(a)(2). The Ministry contends that it agreed to dismiss the district court suit "because [it] [wa]s facing a running of the statute of limitations on its takings claim of increasing value." Notice of Directly Related Case at 2, ECF No. 4.

## VII.    This Action

Solid Rock filed the present complaint on July 12, 2016. ECF No. 1. The currently operative pleading is the corrected complaint it filed on July 13, 2016. ECF No. 6. In that complaint, the Ministry has asserted two claims for relief under the Takings Clause: 1) that the government's actions "[r]esulted in an [u]nconstitutional [t]aking of [its] [v]ested [w]ater [r]ights," id. at 6; and 2) that "due to [the government's] actions, namely an illegal and improperly-constructed water diversion project, Plaintiff has now lost the use of its lands due to repetitive flooding and extensive erosion caused by [the government's] water diversion project," id. ¶ 22. Solid Rock seeks a declaration that the United States has taken its vested water rights and other property (both real and personal) in violation of the U.S. Constitution. Id. at 8. It also seeks an award of compensation in excess of $3 million for the taking of its property. Id. "In lieu of finding and ordering compensation for a total taking," Solid Rock requests that the Court

order the United States to compensate it "for [the] loss of its vested water rights from the date of taking until [the] present." Id. [4]

After the Court denied the government's motion to dismiss the Ministry's takings claims for failure to state a claim, ECF No. 11, the government filed its answer on December 13, 2016, ECF No. 12.

On April 16, 2018, after the discovery period ended, Solid Rock obtained new counsel and, on April 26, filed a motion for an extension of time to 1) allow its new counsel to become familiar with the case and 2) reopen both fact and expert discovery for a period of ninety days. ECF Nos. 31, 33. The government agreed that the Ministry's new counsel should be given a reasonable time to become familiar with the case and have time to depose the government's experts, but otherwise opposed the motion. ECF No. 34. The Court granted the extension in part, reopening expert discovery (but not fact discovery) for sixty days. ECF No. 36.

The government filed a motion for summary judgment on October 5, 2018. ECF No. 41. Oral argument was held on the government's motion on May 7, 2019. After oral argument, the Court directed the parties to file supplemental briefs addressing two issues: 1) whether the Court may and/or should determine the existence and scope of Solid Rock's vested water rights; and 2) whether Solid Rock has submitted sufficient evidence to defeat the government's motion for summary judgment as to the existence of its claimed vested water rights. ECF No. 48. The supplemental briefing is now complete and the government's motion is ripe for decision.

## DISCUSSION

### I.     Standards for Summary Judgment

Summary judgment may be granted where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. RCFC 56(a); Andersen v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." Liberty Lobby, 477 U.S. at 248. An issue is genuine if it "may reasonably be resolved in favor of either party." Id. at 250.

The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). All evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable factual inferences should be drawn in favor of the nonmoving party. Liberty Lobby, 477 U.S. at 255; Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970).

---

[4] The Ministry's amended complaint also included a third claim that the Ministry was denied due process of law in violation of the Fifth Amendment as a result of the government's actions. On November 29, 2016, the Court dismissed that claim for lack of jurisdiction in response to a motion to dismiss the government filed on September 12, 2016. Def.'s Mot. to Dismiss for Lack of Subject Matter Juris. and Supporting Mem. of Law, ECF No. 7; Opinion and Order at 5, ECF No. 11.

The moving party "may discharge its burden by showing the court that there is an absence of evidence to support the nonmoving party's case." Dairyland Power Co-op. v. United States, 16 F.3d 1197, 1202 (Fed. Cir. 1994) (citing Celotex, 477 U.S. at 325). "Once the moving party has satisfied its initial burden, the opposing party must establish a genuine issue of material fact and cannot rest on mere allegations, but must present actual evidence." Crown Operations Int'l, Ltd. v. Solutia Inc., 289 F.3d 1367, 1375 (Fed. Cir. 2002) (citing Liberty Lobby, 477 U.S. at 248). "A nonmoving party's failure of proof concerning the existence of an element essential to its case on which the nonmoving party will bear the burden of proof at trial necessarily renders all other facts immaterial and entitles the moving party to summary judgment as a matter of law." Dairyland Power Co-op, 16 F.3d at 1202.

## II.    The Ministry's Flood-Related Claim

### A.    <u>Legal Framework</u>

The Fifth Amendment to the United States Constitution provides that "private property" shall not be "taken for public use, without just compensation." U.S. Const. amend. V. To establish entitlement to compensation under the Takings Clause, a plaintiff must show: 1) that he has "a property interest for purposes of the Fifth Amendment," Members of the Peanut Quota Holders Ass'n v. United States, 421 F.3d 1323, 1330 (Fed. Cir. 2005) (citing Conti v. United States, 291 F.3d 1334, 1339 (Fed. Cir. 2002)), and 2) that the government's actions "amounted to a compensable taking of that property interest." Am. Pelagic Fishing Co. v. United States, 379 F.3d 1363, 1372 (Fed. Cir. 2004).

A physical taking is effected by "a direct government appropriation" or "physical invasion of private property." Tahoe-Sierra Pres. Council Inc. v. Tahoe Regional Planning Agency, 535 U.S. 302, 314, 318 (2002). It may occur where "real estate is actually invaded by super-induced additions of water . . . so as to effectually destroy or impair its usefulness." Pumpelly v. Green Bay Co. & Miss. Canal Co., 80 U.S. 166, 181 (1871). Regularly recurring flooding may also "g[i]ve rise to a takings claim no less valid than the claim of an owner whose land was continuously kept under water." Ark. Game & Fish Comm'n v. United States, 568 U.S. 23, 32 (2012) (citing United States v. Cress, 243 U.S. 316, 328–329 (1917)).

To prove a taking by flooding, plaintiffs must "establish that government action caused the injury to their properties," i.e., "that the invasion was the 'direct, natural, or probable result of an authorized activity.'" St. Bernard Par. Gov't v. United States, 887 F.3d 1354, 1359–60 (Fed. Cir. 2018), cert. denied sub nom. St. Bernard Par. v. United States, 139 S. Ct. 796 (2019) (quoting Ridge Line Inc. v. United States, 346 F.3d 1346, 1355 (Fed. Cir. 2003)). Put another way, a "property owner must prove that the asserted government invasion of property interests allegedly effecting a taking 'was the predictable result of the government action,'. . . because it was 'the direct or necessary result' of the act or because it was 'within contemplation of or reasonably to be anticipated by the government.'" Vaizburd v. United States, 384 F.3d 1278, 1282–83 (Fed. Cir. 2004) (quoting Ridge Line, 346 F.3d at 1356) (other citations omitted).

Further, "in order to establish causation, a plaintiff must show that in the ordinary course of events, absent government action, [he or she] would not have suffered the injury." St. Bernard Par. Gov't, 887 F.3d at 1362. Therefore, to assess whether the causation element has been met

the Court must determine "'what would have occurred' if the government had not acted." Id. (quoting United States v. Archer, 241 U.S. 119, 132 (1916)).

## B.    The Government's Motion for Summary Judgment as to the Flooding Claim

The government does not dispute that Solid Rock's property was physically invaded by water on the occasions identified by the Ministry. See Def.'s Mot. at 25. And, for purposes of summary judgment, at least, it does not contest that the floods interfered with the Ministry's reasonable expectations as to the use of its land or that the interference was sufficiently severe to constitute a taking.

Nonetheless, the government seeks summary judgment as to the Ministry's flood-related takings claim, alleging that the "uncontroverted evidence refutes any causal link between the Project and Plaintiff's flooding," id. at 26, and that, in any event, "the undisputed facts show that the United States did not intend or foresee the alleged flooding," id. at 30. Specifically, according to the government, heavy rains and not the construction of the dam and restoration channel caused the flooding about which Solid Rock complains. Further, the government argues, flooding would have occurred as a result of the heavy rainfall whether or not the restoration channel had been built. E.g., Def.'s Mot. at 27 (citing id. Ex. 31 (Decl. of Jay Rosenthal), ¶ 7, ECF No. 41-31 (observing that each period of claimed flooding "was preceded or coincided with a period of abnormally heavy rains in southwestern Nevada")).

The government cites several facts in support of its theory of causation. It observes that the Camp is located in a flood plain. Id. at 29 (citing id. Ex. 9, ECF No. 41-9). The government also notes that even before the restoration channel was built, heavy rainfall had caused flooding in the Ash Meadows NWR in 1995, 1998, 2005, and 2008, and on the Ministry's property in particular on the latter two occasions. Id. at 11–12 (citing id. Ex. 4, at US010236–39, ECF No. 41-4; id. Ex. 6 (Dep. of Sharon McKelvey), at 70:7–71:20, ECF No. 41-6; id. Ex. 7 (Dep. of Victor Fuentes, Aug. 4, 2017), at 152:20–153:1, ECF No. 41-7). The government further relies upon the testimony of Dr. Thompson, its expert in hydrology, who stated that given the restoration channel's limited capacity "the huge volumes of storm water produced by . . . the storms would completely bypass the restoration channel and flow throughout the Carson Slough, as has occurred historically." Id. at 28.

The government contends that Solid Rock has also failed to introduce sufficient evidence to create a dispute of material fact regarding whether the Service intended or "should have foreseen increased flooding of Plaintiff's property." Def.'s Mot. at 30–31. It observes that Otis Bay, the Service's contractor, "used hydrologic modeling to show the different amounts of flow that would be expected for different rain recurrence intervals . . . [and it] confirmed that the Service's Project would not impact flooding on the private properties within the Refuge for a two-year to a 100-year rain event." Id. at 31–32.

For its part, Solid Rock observes that—to the best of its knowledge—the areas of the property that were flooded after the dam and restoration channel were built (i.e., the areas that housed the Camp's buildings) had never flooded before. Pl.'s Resp. at 20. It argues that were it not for the Project the water would have passed through the Camp "at lower elevation to the west

and south of the structures and through the natural channels and wetland." Id. at 16 (emphasis removed).

The Ministry relies upon the testimony of its expert hydrologist, Dr. Blaine Reely, to establish causation and foreseeability. In his report, Dr. Reely opines that "the historic surface water hydrologic regime was significantly changed" by the Project and that the Project "resulted in a condition whereby [the Ministry's] property was subjected to a significantly increased risk of flooding." Id. Ex. B, at 3, ECF No. 44-2; id. Ex. A, at 4–5, ECF No. 44-1. Dr. Reely further testified that the project "directly resulted in the flooding of [the Ministry's] property." Id. Ex. A, at 5. Moreover, in a rebuttal report, Dr. Reely challenged the soundness of the opinions of the government's expert regarding, among other things, the extent to which the rainfall that fell in December 2010 was unusually heavy. Id.; see also id. Ex. C, at 2, ECF No. 44-3.

The Court agrees with the government that Dr. Reely's report and deposition are short on details to support his conclusions that the building of the restoration channel resulted in flooding of the Camp that would not have otherwise occurred. There also does not appear to be much (if any) evidence one way or the other regarding whether the area where the structures have been placed ever flooded before the restoration channel was built. The government therefore argues that Dr. Reely's report and testimony is insufficient to defeat its motion for summary judgment as to causation and foreseeability.

It is well established, however, that "due to the fact-intensive nature of takings cases, summary judgment should not be granted precipitously." Moden v. United States, 404 F.3d 1335, 1342 (Fed. Cir. 2005) (citing Yuba Goldfields, Inc. v. United States, 723 F.2d 884, 887 (Fed. Cir. 1983)); see also Ark. Game & Fish, 568 U.S. at 31 (observing that "most takings claims turn on situation-specific factual inquiries."). The Court's view is that caution is especially warranted where, as here, the factual disputes require resolution of disagreements involving technical matters such as the causes of the flooding that occurred on the Ministry's property. The Court is not prepared to make factual determinations or compare the relative strengths of the experts' testimony on a paper record, in the context of summary judgment proceedings, and without seeing the property for itself.

Drawing all inferences in favor of the Ministry, the Court concludes that there exist genuine issues of material fact regarding whether the dam and restoration project caused flooding at the Camp that would otherwise not have occurred, and whether such flooding was reasonably foreseeable. The government's motion for summary judgment as to the Ministry's flood-related takings claim is therefore **DENIED**.

## III.   Solid Rock's Water Rights

The Federal Circuit has recognized that the government's physical appropriation of water to which a plaintiff has valid rights under state law may constitute a taking under the Fifth Amendment. See, e.g., Casitas Mun. Water Dist. v. United States, 543 F.3d 1276, 1296 (Fed. Cir. 2008) (determining that a physical takings analysis was appropriate where the government "directly appropriate[s] . . . water for its own use—for the preservation of an endangered species"). In such cases, state law "define[s] the dimensions of the requisite property rights for purposes of establishing a cognizable taking." Klamath Irrigation Dist. v. United States, 635 F.3d

505, 511 (Fed. Cir. 2011) (noting that the Court of Federal Claims applied Oregon law to determine whether the plaintiffs possessed relevant water rights). In this case, Solid Rock contends that it has vested rights under Nevada law in surface water which it alleges had flowed through its property since the late 1800s and that those rights were taken when the Service rerouted the water into the restoration channel. Pl.'s Resp. at 30.

At the outset, the Court notes that the Ministry has taken inconsistent positions both before the State Engineer and in this litigation regarding the bases and contours of its alleged vested water rights. As described above, the Ministry has claimed vested water rights before the State Engineer based upon: 1) pre-statutory use of the surface water for stock watering; 2) a pre-statutory right to instream flow to use for wildlife and "to maintain the historic acquatic-riparian ecosystem"; and 3) pre-statutory use of the water for irrigation. The amount of water it has claimed it is entitled to appropriate has also varied widely among its submissions to the State Engineer from 0.0031 cfs (equivalent to the flow of a garden hose) to 8.95 cfs (allegedly the entire flow of the Carson Slough).

In this litigation, the Ministry's complaint alleges a taking of its "water rights" without elaborating on their basis or scope. See Compl. ¶ 6. Then, in its responses to the government's interrogatories requesting that it identify the specific property interest alleged to have been taken, it claimed "water rights in the minimum amount of 6,532 acre feet annually, including but not limited to vested rights in the minimum amount of 2.4 acre feet annually and certified rights, previously and fraudulently claimed by Defendant, in the minimum amount of 34.5 acre feet annually." Def.'s Mot. Ex. 29, at 1, ECF No. 41-29. In its initial brief opposing the government's motion for summary judgment, the Ministry argued that it had "made a plausible claim for vested water rights to the Nevada State Engineer," and stated that its vested water rights were based on pre-statutory use of the water "for livestock watering and/or irrigation." Pl.'s Resp. at 34.

At oral argument, and again in its Supplemental Brief, the Ministry seems to have settled upon asserting a claim to vested water rights that is based on the alleged pre-statutory diversion and appropriation of surface water for use in irrigation by its predecessors in interest. See Pl.'s Suppl. Mem. in Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Suppl. Mem.") at 10, ECF No. 54 (stating that "[a]t a minimum, Solid Rock has provided evidence of its claims to vested water rights sufficient to irrigate 25 acres of land"). This claim is the same as the one set forth in Proof of Claim V11308, which is currently pending before the NSE. See Def.'s Mot. Ex. 30, at 1. In that Proof of Claim, the Ministry again asserted that it was entitled to 8.95 cfs of water, i.e., the entire flow of the Carson Slough.

The government contends that the Ministry's water rights takings claim is not ripe for determination by this Court and/or that the Court should abstain from deciding it. Suppl. Mem. of the U.S. in Supp. of Mot. for Summ. J. ("Def.'s Suppl. Mem.") at 5, ECF No. 53. It so contends because the vested water right the Ministry appears to have settled on—i.e., the right to divert and use sufficient water to irrigate twenty-five acres of land—is, as noted, also the subject of a pending claim filed with the Nevada State Engineer. Id. It further argues that, in any event, Solid Rock has failed to produce evidence sufficient to establish either the existence of the vested water right it claims or that the right it claims was taken. See id. at 15.

For the reasons set forth below, the Court rejects the government's ripeness and abstention arguments. It finds, however, that the Ministry has failed to submit sufficient evidence to defeat the government's motion for summary judgment as to its claim that it suffered a taking of its water rights, whether based on the pre-statutory diversion and use of the water for irrigation or for stock watering purposes.

## A.   Ripeness/Abstention

As described above, the State of Nevada has established a comprehensive scheme for the administration and adjudication of water rights. As also explained above, over the last eight years since the Restoration Project was completed, the Ministry has several times invoked that scheme by filing proofs with the NSE asserting that it possesses vested rights to divert and use varying amounts of the water that it alleges historically flowed over its property. The NSE has found "plausible" only the Ministry's claim that it has a vested right to appropriate 0.0031 cfs of water for stock watering purposes. Def.'s Mot. Ex. 21, at MRS0386.

As noted, the claim the Ministry presses here—seeking recognition of a vested right to divert and appropriate enough water to irrigate some twenty-five acres of land—is now pending before the NSE, where it is apparently set for a hearing in December. The government contends that the Ministry's takings claim is not ripe for adjudication "absent a final decision by the NSE on the pending submissions." Def.'s Suppl. Mem. at 5, 7. This is so, according to the government, because "[w]ithout a final decision by the NSE, the full extent, if any, of the putative property interest on which Plaintiff bases its taking claim is unknown." Id. at 8.

The Court rejects the government's argument that the Ministry's water rights takings claim is not ripe for review. "The ripeness doctrine is designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements.'" Martin v. United States, 894 F.3d 1356, 1362 (Fed. Cir. 2018), cert. denied, 139 S. Ct. 802 (2019) (quoting Abbott Labs. v. Gardner, 387 U.S. 136, 148 (1967), overruled on other grounds, Califano v. Sanders, 430 U.S. 99 (1977)). "A claim for relief is not ripe for judicial review when it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" Id. (quoting Thomas v. Union Carbide Agric. Prods. Co., 473 U.S. 568, 580–81 (1985)).

This case does not involve an abstract disagreement; nor is its resolution dependent on contingent future events. The Ministry claims that it possesses vested water rights under state law that the FWS took when it physically re-routed the water that had once flowed over the Ministry's land. Vested water rights exist independent of the statutory scheme established in the Nevada water law and are not contingent on any determination by the NSE. See Nev. Rev. Stat. § 533.085 (stating that "[n]othing contained in this chapter shall impair the vested right of any person to the use of water, nor shall the right of any person to take and use water be impaired or affected by any of the provisions of this chapter where appropriations have been initiated in accordance with law prior to March 22, 1913"); see also Hage v. United States, 35 Fed. Cl. 147, 163 (1996) (observing that "in Nevada, the water rights exist independent of the stream adjudication"). In fact, the NSE does not have the authority to adjudicate vested water rights claims; that authority rests with the Nevada state courts.

Further, in a takings case, it is the court's obligation to determine whether the plaintiff has a property interest under state law. See, e.g., Maritrans Inc. v. United States, 342 F.3d 1344, 1351–52 (Fed. Cir. 2003) (explaining that the court's first step in a takings analysis is to "evaluate whether the claimant has established a property interest for purposes of the Fifth Amendment" and that "independent source[s] such as state, federal, or common law[] define the dimensions of the requisite property rights for purposes of establishing a cognizable taking." (internal quotations marks omitted)); Preseault v. United States, 100 F.3d 1525, 1534 (Fed. Cir. 1996) (applying state law to determine the threshold question of property ownership in a takings analysis); Bourgeois v. United States, 545 F.2d 727, 729 n.1 (Ct. Cl. 1976) (observing that the Court of Claims "is an appropriate forum where plaintiff can try title by seeking just compensation for the taking of land by the United States"); Hage, 35 Fed. Cl. at 159 (observing that the court "has jurisdiction to determine title to real property as a preliminary matter when addressing a taking claim"). The Court is not required to await a state administrative or judicial resolution before making its determination, and such forbearance would be inappropriate where, as here, that resolution could be many years away. See Shinnecock Indian Nation v. United States, 782 F.3d 1345, 1348 (Fed. Cir. 2015) (citing Abbott Labs., 387 U.S. at 149) (observing that in determining ripeness, the court must consider "the hardship to the parties of withholding court consideration").; see also Hage, 35 Fed. Cl. at 160 (rejecting the argument that the Court of Federal Claims lacks jurisdiction to adjudicate the scope of vested water rights absent a statutory adjudication proceeding pursuant to Nevada law); id. at 163 (rejecting the argument that a plaintiff's claim of vested water rights under Nevada law is not ripe until the conclusion of statutory adjudication proceedings).[5]

The cases the government cites in support of its ripeness objection are inapposite. They involved regulatory takings claims held not ripe because the administrative agencies alleged to have effected the takings had not finally determined the restrictions that they would impose on the plaintiffs' property interests. See McGuire v. United States, 707 F.3d 1351, 1359 (Fed. Cir. 2013) (quoting Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank, 473 U.S. 172, 190 (1985)) (observing that "a property-holder must obtain 'a final decision regarding how it will be allowed to develop its property' before pursuing a regulatory takings claim"); Estate of Hage v. United States, 687 F.3d 1281, 1286 (Fed. Cir. 2012) (explaining that ripeness presents concerns in regulatory takings cases because "evaluating whether the regulations effect a taking requires knowing to a reasonable degree of certainty what limitations the agency will, pursuant to regulations, place on the property" (internal alterations omitted)).

This case involves an alleged physical taking, not a regulatory one. See Washoe Cty. v. United States, 319 F.3d 1320, 1327 (Fed. Cir. 2003) (explaining that a physical takings analysis applies where the government "physically diverted or appropriated [] water []or physically reduced the quantity of water . . . available to [the plaintiff] from the water source"). The Court is

---

[5] The government's assertion that the court of appeals rejected the reasoning of these aspects of the Hage decisions, Def.'s Suppl. Mem. at 9, lacks merit. There is nothing in the Federal Circuit's opinion that references, much less addresses, whether the court should have stayed its hand during the pendency of state administrative proceedings. See generally Estate of Hage v. United States, 687 F.3d 1281, 1286 (Fed. Cir. 2012).

not aware of any physical takings case in which a federal court declined to determine whether a plaintiff had a property interest under state law on ripeness grounds.

Nor does the Court agree with the government's suggestion that—in light of the pending claim before the NSE—it should abstain from opining on Solid Rock's claimed water rights. Federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them." Arizona v. San Carlos Apache Tribe of Ariz., 463 U.S. 545, 571 (1983) (citing Colo. River Water Conservation Dist. v. United States, 424 U.S. 800, 817 (1976)). "The doctrine of abstention, under which a [federal court] may decline to exercise or postpone the exercise of its jurisdiction, is an extraordinary and narrow exception to the duty of a [federal court] to adjudicate a controversy properly before it." Colo. River Water Conservation Dist., 424 U.S. at 813 (quoting Cty. of Allegheny v. Frank Mashuda Co., 360 U.S. 185, 188–89 (1959)).

The government argues that it is appropriate to apply this extraordinary and narrow exception here because abstention would "permit the state administrative process to be completed" and also "avoid potentially conflicting state and federal decisions as to the same asserted water rights." Def.'s Suppl. Mem. at 10. But at this point, there is no pending parallel state court proceeding that will adjudicate the Ministry's vested rights and there may never be such a proceeding. There is only the administrative proceeding before the NSE, which lacks the authority to adjudicate vested rights claims.

Further, and contrary to the government's argument, the Court will not be required to establish a "procedure" for all "known and unknown parties to assert their claims" in order to adjudicate the Ministry's takings claims. Id. at 11. This Court's decision regarding the scope of the Ministry's water rights will affect only the Ministry's entitlement to compensation. It does not bind the state court in determining the relative rights of claimants under a stream adjudication. The government's objections to the Court's assumption of jurisdiction over the Ministry's takings claim are therefore rejected.

### B.     Water Rights Takings Claims

#### 1.     Vested Right Based on Pre-Statutory Diversion and Use of Water for Irrigation

As explained above, under Nevada law, a vested right may be established by showing both "the diversion of [] water . . . and its application to a beneficial use by the owners or possessors of irrigable lands" prior to the enactment of the modern water law. Prosole v. Steamboat Canal Co., 140 P. 720, 723 (Nev. 1914); see also Application of Filippini, 202 P.2d at 537 (defining a vested water right as "a right to use water [that] has become fixed either by actual diversion and application to beneficial use or by appropriation, according to the manner provided by the water law"). Solid Rock contends that the record before the Court is sufficient to raise a genuine issue of material fact regarding whether its predecessors in interest diverted the waters of the Carson Slough before 1905 and used them to irrigate the land the Ministry now owns.

Solid Rock refers the Court to a brochure prepared by the Nevada State Engineer which describes how it assesses vested water rights claims. Pl.'s Suppl. Mem. at 11 (citing Nevada

Division of Water Resources, <u>Evidence of Priority: A Guide to Sources That May Constitute Proof of Vested Water Rights</u> (Oct. 2015) http://water.nv.gov/documents/Brochure_Evidence_of_Priority_October_2015.pdf). It contends that the evidence it has placed before the Court is sufficient to meet the State Engineer's standards and is therefore, at the very least, sufficient to defeat the government's motion for summary judgment.

The Court is not persuaded by this argument. The NSE brochure states that "[p]roof of a vested water right must be provided by the claimant with thorough and specific supporting documentation." <u>Evidence of Priority</u>, at 1. Such documentation, the brochure provides, "can take many forms" and will generally "be sufficient if it tends to show that water was used for the purpose claimed, in the year claimed as the priority date, and on the land claimed as the place of use." <u>Id.</u> The documentation may include "[h]omestead entry documents," "Possessory Claims or Water Claims" on record at the county recorder's office, General Land Office records, "[c]ounty tax rolls prior to 1905 showing numbers of . . . irrigated acres," "[i]ncome tax documents showing income from sale of crops," affidavits by "someone with personal knowledge of when beneficial use was first made, such as a neighbor or a previous owner of the property," "[r]ecords of the person or business who sold, installed, or constructed the diversion works," and "[p]ublished historical accounts of grazing, ranching, mining, etc. within the area encompassed by the adjudication." <u>Id.</u> at 1–2.

The Ministry's documentation fails to pass muster under the NSE's standards because it does not support the assertion that the Ministry's predecessors in interest used the waters of the Carson Slough before 1905 "for the purpose claimed" (irrigation) "on the land claimed as the place of use" (the Ministry's forty-acre parcel). <u>Id.</u> at 1.

For example, the Ministry references the 1881 and 1882 General Land Office maps it provided to the NSE. <u>See</u> Pl.'s Suppl. Mem. at 12 (citing Pl.'s Resp. Ex. D, at 16; <u>id.</u> Ex. RR, at MRS0018, ECF No. 44-51). But those maps reflect at most that a stream then passed through Solid Rock's property with "marsh land" on either side of it. <u>See</u> Def.'s Mot. Ex. 23, at 5, ECF No. 41-23; Pl.'s Resp. Ex. RR, at MRS0018. Neither map provides evidence that any of the area depicted was then being farmed and neither depicts any irrigation ditches or other evidence of the diversion of water for irrigation purposes.

Solid Rock also cites a recently drawn map that depicts the growth of meadow hay on twenty-five acres of the Ministry's land. Pl.'s Suppl. Mem. at 17–18 (citing Pl.'s Resp. Ex. D, at 14). Although it is difficult to tell from the document, it was apparently prepared to reflect the Ministry's plans to plant meadow hay going forward. It provides no evidence of such planting before 1905, much less evidence of the pre-statutory diversion of water for irrigation purposes.

The Ministry has also referenced two documents that might be considered "published historical accounts" within the meaning of the NSE brochure. The first, a project report on the Fairbanks Channel Restoration, contains a sentence which states that "throughout the mid-1900[s] settlers ran small-scale farming operations around the springs and outflow channels" of the Carson Slough. Def.'s Mot. Ex. 15, at 1, ECF No. 41-15. But this brief reference describes activities that took place in the middle of the twentieth century, not the operative time period: i.e., before 1905. The language cited also does not specify that the "small-scale farming

operations" took place "within the area encompassed by the adjudication," i.e., the Ministry's forty-acre parcel. Evidence of Priority, at 2.

The second "published historical account" upon which the Ministry relies is contained in the FWS Recovery Plan for the Endangered and Threatened Species of Ash Meadows. See Pl.'s Suppl. Mem. at 12 (citing Def.'s Mot. Ex. 1, at US000475). It contains a sentence stating that, during the late 1800s "[s]ettlers occupied the [Ash Meadows] area to utilize its waters for growing crops." id. Ex. 1, at US000475. But this language also does not address whether the Ministry's forty-acre parcel was used for farming, much less whether the settlers who are referenced diverted water from the Carson Slough to irrigate their land.

The Ministry also supplied the State Engineer with a report prepared by Haas & Associates which purports to be based on "a detailed study of county records, with personal interviews as well as research into the various histories and interviews." Pl.'s Resp. Ex. RR, at MRS0004. The report notes that in 1887 the County assessed taxes on the 640-acre parcel then owned by Alice Ober (of which the Ministry's forty-acre parcel was then a part). Id. at MRS0005. But the taxes, which were assessed for horses, stock cattle, hogs, fowl, wagon machinery, and five tons of grain, do not provide evidence that any part of the 640-acre parcel, much less the forty acres now owned by the Ministry, were farmed. Instead they are consistent with the notion that the waters were used for livestock. [6]

In addition, the Haas report references county records which show that in 1931 the 640-acre parcel, then owned by Key Pittman, was classified as "3rd Class Grazing Land," and that it had been so classified since 1913." Pl.'s Resp. Ex. RR, at MRS0005–07; Def.'s Mot. Ex. 21, at MRS0386–87; Pl.'s Suppl. Mem. Ex. B, ECF No. 54-2. The fact that the 640-acre parcel was classified for tax purposes as third-class grazing land does not provide evidence that water was diverted from the Carson Slough to irrigate that land, in fact it suggests the opposite. Under current Nevada law, "grazing" land (as opposed to "pasture" or "cultivated" land) is explicitly characterized as land that "usually lacks irrigation." See Nevada Department of Taxation, 2017–2018 Agricultural Land Values Open Space Property Procedures, at 2,

---

[6] At the oral argument in this case, counsel for the Ministry asserted that the five tons of grain for which taxes were assessed was grown on the 640-acre parcel that Ms. Ober owned. Hr'g Tr. at 56, ECF No. 50. But in 1887, Nevada law provided for the taxation of all personal property (subject to some limited exceptions), including "all chattels of every kind and description . . . stocks of goods on hand, horses . . . cattle of every description, wagons, carriages, [etc]." Dav. E. Bailey & John D. Hammond, General Statutes of the State of Nevada in Force from 1861 to 1885, Inclusive, at 300 (1885) (emphasis supplied); see also Henry C. Cutting, Compiled Law of Nevada in Force from 1861 to 1900 (Inclusive), at 242–43 (1900). The grain would have been taxed whether it was grown on Ms. Ober's property or instead purchased for use to, for example, feed the livestock. Further, if Ms. Ober irrigated her land, one might expect the tax assessment roll to list the irrigation systems she used because Nevada law required the listing of "improvements on real estate." Baily & Hammond, Statutes of Nevada in Force from 1861 to 1885, at 305; Cutting, Compiled Laws of Nevada in Force from 1861 to 1900, at 248. Neither the Haas report, nor the tax records the Ministry has supplied (much of which are illegible) appears to reflect such improvements.

https://tax.nv.gov/uploadedFiles/taxnvgov/Content/Boards/State_Board_of_Equalization_Forms/Item%201-d.%20%202017-18_Ag_Bulletin_206.pdf. As of 1921 at least, similar definitions were used to distinguish "grazing" land from land that was irrigated and/or used for farming. See Nevada Tax Commission, Biennial Report of the Nevada Tax Commission, at 7–8 (1921). And third class grazing land was defined as "the poorest natural range lands used for ranging livestock," just one level above "barren" or "mountain" land. Id. at 28. Notably, the Haas report contains no citation of "[c]ounty tax rolls prior to 1905 showing numbers of . . . irrigated acres," as suggested in the brochure. Evidence of Priority, at 2. Nor does it reference "[i]ncome tax documents showing income from sale of crops," another of the types of documents the NSE brochure suggests it would consider relevant. Id.

Indeed, the Haas report was submitted to support the Ministry's original proof of appropriation number V10092 in which it asserted a pre-statutory use for stock watering, not irrigation. Pl.'s Resp. Ex. RR, at MRS0001–17. And the report's "Brief History" section states that "[t]hroughout most of the years from the founding to th[e] current date, the property has seen reasonably continued use for domestic needs and grazing (it is so classified by the county assessor) by the various owners." Id. at MRS0004. It does not mention any history of farming or irrigation. Id.

Finally, the Court notes that in Proof of Appropriation V11308, first filed in July 2018,[7] the Ministry asserted that the historical "means of diversion" of the water in Carson Slough has been through a "[n]atural [c]hannel" as opposed to, for example, a "dam and ditch, pipeline, flume, [or] underground." Def.'s Mot. Ex. 30, at 1. This assertion appears to contradict any claim to vested water rights based on pre-statutory use for irrigation (as opposed to, for example, stock watering) because before the statute was enacted, proof of diversion was required to establish use for irrigation. See Steptoe Live Stock Co. v. Gulley, 295 P. 772, 774–75 (Nev. 1931) (stating that proof of diversion was required because, in contrast to stock watering, "it was absolutely necessary to divert water from a stream to appropriate it to agricultural uses in an economical manner"); see also State v. Morros, 766 P.2d 263, 266 (Nev. 1988) (acknowledging the existence of a pre-statutory diversion requirement).[8]

In short, the Ministry has failed to submit evidence sufficient to create a genuine issue of material fact regarding whether its predecessors in interest diverted the waters of the Carson Slough to irrigate the Ministry's land before 1905. Therefore, the government is entitled to

---

[7] In January of 2019, the Ministry filed a corrected version of its original proof of appropriation. It has submitted that version to the Court along with its supplemental brief opposing summary judgment. See Pl.'s Suppl. Mem. Ex. A, ECF No. 54-1.

[8] In its supplemental brief, the Ministry observes that "while Solid Rock's land still retains various diversion/irrigation ditches . . . it would be surprising if diversion mechanisms from the late 1800s or early 1900s would remain." Pl.'s Suppl. Mem. at 16 (citing Def.'s Mot. Ex. 10 (Dep. of Ronald D. Matheny), at 6, ECF No. 41-10). But Mr. Matheny did not testify that the ditches on the land were ever used for irrigation purposes. And while the Court agrees that ditches that were in use over 100 years ago would be unlikely to still exist on the property, there is no evidence before the Court that ditches used for irrigation were ever present on the property.

summary judgment as to the Ministry's claim that the government effected a taking of a vested water right based on the pre-statutory diversion and use of the waters of the Carson Slough for irrigation purposes. See Scott v. Harris, 550 U.S. 372, 380 (2007) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986)) (explaining that where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial" and summary judgment is appropriate (internal quotation marks and alterations omitted)).

### 2.      Vested Right to Use Water for Livestock

For the reasons set forth above, the Court has concluded that the Ministry's evidence cannot support a claim to vested water rights based on the pre-statutory diversion and use of water from the Carson Slough for irrigation. The State Engineer, however, has opined that the Ministry's claim to a vested right based on the pre-statutory use of the waters for stock watering was a "plausible" one. Def.'s Mot. Ex. 21, at MRS0388. He based that finding on, among other things, copies of county tax records showing that in 1887 Alice Ober was assessed taxes for livestock she kept on the 640-acre parcel, and records showing taxes assessed against Key Pittman from 1913 through 1942 at rates for third class grazing land. Id.; see also Def.'s Mot. Ex. 21, at MRS0386–87. These records, along with other evidence showing that livestock was kept on the property by succeeding owners, are sufficient to raise a genuine issue of material fact as to whether the Ministry's predecessors in interest used water from the Carson Slough for their livestock before 1905.

As noted above, it remains unclear to the Court whether the Ministry is pressing a takings claim with respect to vested water rights that are based on the pre-statutory use of water for livestock. It notes, however, that the evidence of record is undisputed that—since the Permit was granted, providing the Ministry with the amount of water it alleged it was entitled to for that purpose—the Ministry has not used the water made available to it. U.S. Reply Br. in Supp. of Its Mot. for Summ. J. Ex. 1 (Dep. of Victor Fuentes), at 307:13–308:3, ECF No. 45-1. Further, Pastor Fuentes has acknowledged that he has not explored ways to transport the water being supplied by FWS so that it would be usable for livestock or for other purposes as provided in the Ministry's permit. Id. at 306:12–24. In fact, he testified that what he seeks is recognition of a vested right that does not exist under Nevada law—i.e., the right to use "surface water coming through the natural flow channel." Id. at 306:12–308:3; see also id. at 307:24–308:3 (agreeing that, in his view, the Ministry was "entitled to [have water] flow through the property so [it] can just take out the little bit [it is] entitled to" which, Pastor Fuentes observed, was "[j]ust like Fish and Wildlife do.").[9]

---

[9] Before the enactment of the statutory water law, a right to use water for instream flow was not recognized in Nevada because "both diversion and application to beneficial use were required to appropriate water." See Morros, 766 P.2d at 267 (citing Prosole, 140 P. at 722). In 1969, the Nevada legislature enacted Nev. Rev. Stat. § 533.030(2) which for the first time "recognize[d] recreation as a beneficial use of water." Id. Because "[d]iversions are not needed for and are incompatible with many recreational uses of water . . . enactment of NRS 533.030(2) mandate[d] recognition of in situ water appropriation for recreation . . ." Id. (citing McClellan v. Jantzen, 547 P.2d 494, 496 (Ariz. Ct. App. 1976) (observing that "when 'wildlife, including fish' and . . .

Under the reasoning of the court of appeals in <u>Hage</u>, the Ministry's decision not to use the water to which it arguably has a vested right based on pre-statutory stock watering usage is fatal to its takings claim because under Nevada law, a "water rights holder has no rights to the water beyond what he can put to beneficial use." <u>Estate of Hage</u>, 687 F.3d at 1288–89; <u>see also</u> Nev. Rev. Stat. § 533.035 (beneficial use is "the basis, the measure and the limit of the right to the use of water"); Nev. Rev. Stat. § 533.070 (the quantity of water that may be appropriated "shall be limited to such water as shall reasonably be required for the beneficial use to be served"). Thus, in <u>Hage</u>, the plaintiffs claimed that their water rights were taken when the government constructed fences around certain springs and streams on federal lands for which the plaintiffs held grazing permits. 687 F.3d at 1289. The court of appeals held that "to establish their Fifth Amendment takings claim, the [plaintiffs] had to prove, <u>inter alia</u>, that any water taken could have been put to beneficial use." <u>Id.</u>; <u>see also</u> <u>Washoe Cty.</u>, 319 F.3d at 1322 (holding that "[a]lthough a water right is property subject to constitutional protection, it is usufructuary in nature, meaning that it is a 'right to use' water in conformance with applicable laws and regulations"). The court held that the <u>Hage</u> plaintiffs' takings claims were "flawed" because the plaintiffs supplied "no evidence that the government actually took water that [the plaintiffs] could have put to beneficial use." 687 F.3d at 1290. Specifically, the plaintiffs did not allege that there was insufficient water for their cattle as a result of the fence the government had placed; nor did they argue that they could have put more water to use had the government not constructed the fences. <u>Id.</u>

The Ministry's claim is similarly flawed. The Ministry asserted a vested right to use the waters of the Carson Slough for stock watering and represented that the quantity of water it would apply to that use was 2.24 afa (or 0.0031 cfs). Nonetheless, as described above, it did not use the water it received, and Pastor Fuentes has indicated that he has no interest in doing so. The Court therefore finds that the government is entitled to summary judgment as to the Ministry's claim that the Service's diversion project resulted in a taking of its water rights.

## CONCLUSION

For the foregoing reasons, the government's motion for summary judgment is **GRANTED-IN-PART** and **DENIED-IN-PART**. The Court **GRANTS** the government's motion for summary judgment as to the Ministry's claim that the Fish and Wildlife Service effected an uncompensated taking of its claimed vested water rights in violation of the Fifth Amendment. Because genuine disputes of material fact exist regarding the Ministry's flood-related takings claim, the government's motion for summary judgment as to that claim is **DENIED**.

The parties shall file a joint proposed pretrial scheduling order by December 2, 2019. The schedule will propose dates for the exchanges required by RCFC, Appendix A ("Appendix A"), ¶ 13, the filings required by Appendix A, ¶¶ 14 through 18, and the pretrial conference, as well as dates for trial during the first two weeks of March 2020. Unless the parties suggest

---

when 'recreation' were added to the purposes for appropriation, the concept of in situ appropriation of water was introduced—it appearing to us that these purposes could be enjoyed without a diversion")).

otherwise, the Court's intention is that the trial will be held at the United States District Court in Las Vegas, Nevada.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge